# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TROY JACQUES,<br><br>   Plaintiff,<br><br>  v.<br><br>BANK OF AMERICA CORPORATION,<br><br>   Defendant. | Case No.  1:12-cv-00821-SAB<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>(ECF Nos. 145-153, 155, 161-167, 168-170, 177, 178, 181, 182) |

Currently before the Court is Defendant Bank of America N.A.'s ("Bank of America" or "Defendant") motion for summary judgment.  Oral argument on the motion was heard on August 19, 2016.  Stephen Cornwell and Peter Bradley appeared for Plaintiff Troy Jacques and Alice Kokodis appeared for Defendant Bank of America.  Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, arguments presented at the August 19, 2016 hearing, as well as the Court's file, the Court issues the following order.

## I.

## PROCEDURAL HISTORY

Plaintiff filed this action in the Superior Court of California for the County of Fresno on February 23, 2012.  (ECF No. 1-1.)  Defendants removed the action to the Eastern District of California on May 18, 2012.  (ECF No. 1.)  The original complaint filed in state court named Bank of America, First Advantage Background Services Corp. ("First Advantage") and Early

1  Warning Services, LLC ("EWS") as defendants.  The original complaint contained one cause of
2  action for defamation.

3       On June 13, 2012 and June 18, 2012, the Court granted motions to dismiss filed by First
4  Advantage and EWS.  (ECF Nos. 12, 13.)  On July 12, 2012, Plaintiff filed his first amended
5  complaint.  (ECF No. 15.)  The first amended complaint also raised one cause of action for
6  defamation against Bank of America, First Advantage and EWS.  On October 29, 2012,
7  Plaintiff's claims against First Advantage and EWS were dismissed pursuant to a stipulation
8  signed by Plaintiff.  (ECF No. 34.)

9       On November 7, 2012, the Court granted a motion to dismiss filed by Bank of America.
10 (ECF No. 38.)  On November 21, 2012, Plaintiff filed a second amended complaint.  (ECF No.
11 39.)  Plaintiff's second amended complaint raised a single cause of action for defamation against
12 Bank of America, First Advantage and EWS.  Plaintiff's claims against First Advantage and
13 EWS were voluntarily dismissed on November 28, 2012.  (ECF No. 40.)  Bank of America filed
14 a motion to dismiss the second amended Complaint (ECF No. 41), which was denied on January
15 9, 2013 (ECF No. 47).  Bank of America filed an answer on February 5, 2013.  (ECF No. 49.)

16      Pursuant to a stipulation, Plaintiff filed a third amended complaint on April 4, 2013.
17 (ECF No. 59.)  The third amended complaint only named Bank of America as a defendant and
18 raised causes of action for defamation, intentional infliction of emotional distress, negligent
19 infliction of emotional distress, and for a permanent injunction.

20      On June 21, 2013, the Court partially granted Plaintiff's motion to file a fourth amended
21 complaint.  (ECF No. 71.)  Plaintiff filed a fourth amended complaint against Bank of America
22 alleging violations of California Labor Code sections 1050 and 1052, defamation, intentional
23 infliction of emotional distress, negligent infliction of emotional distress, interference with
24 contract, breach of the implied covenant of good faith and fair dealing, and sought declaratory
25 relief and a permanent injunction.  (ECF No. 72.)  Defendant filed an answer on July 16, 2013.
26 (ECF No. 73.)  An amended answer was filed on September 19, 2013.  (ECF No. 82.)

27      On September 3, 2014, the Court issued an order granting Plaintiff's request to file a fifth
28 amended complaint.  (ECF No. 95.)  Plaintiff's fifth amended complaint was filed on September

4, 2014, against Defendant Bank of America and EWS.  (ECF No. 96.)  Plaintiff's fifth amended complaint alleged claims of violations of California Labor Code sections 1050 and 1052, defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, interference with contract, breach of the implied covenant of good faith and fair dealing, and the Fair Credit Reporting Act, and sought declaratory relief and a permanent injunction.  On January 15, 2015, an order issued granting EWS motion to dismiss.  (ECF No. 122.)

On June 27, 2016, Defendant filed the instant motion for summary judgment and a request to seal documents.  (ECF Nos. 145-155.)  Plaintiff filed an opposition on July 18, 2016, and joined in Defendant's request to file documents under seal.  (ECF Nos. 161-167.)  On July 25, 2016, Defendant filed a reply.  (ECF Nos. 168-170.)  On August 22, 2016, the parties filed exhibits for consideration.  (ECF Nos. 181, 182.)

## II.

## UNDISPUTED FACTS[1]

1.     On December 2, 2005, Plaintiff began employment with Defendant as a customer service representative at its call center in Fresno, California.  (Depo. of Troy Jacques 29:1-10.)

2.     On December 2, 2005, Plaintiff executed an acknowledgment attesting that he read and understood the Bank's Code of Ethics and General Policy on Insider Training.[2] (Acknowledge attached as Exhibit A:2 to Depo. of Troy Jacques.)

3.     The introduction section of the Code of Ethics states, in part:

> the Bank of America Code of Ethics [] provides basic guidelines of business practice, and professional and personal conduct, that we are expected to adopt and uphold as Bank of America employees….

> You are expected to follow the information in this Code, other policies referred to in this document, additional policies that apply to your specific job, and the spirit and letter of all laws and regulations.  Violations of the

---

[1] In determining the facts which are undisputed the Court has considered the joint statement of undisputed facts, Defendant's statement of undisputed facts, and Plaintiff's statement of disputed facts which Defendant does not dispute.  Further, the parties stated disputes that are based upon a different interpretation of the inference raised in the fact do not cause a factual dispute.  The Court has only included those facts which it finds to be material to the instant motion and for which the opposing party has not demonstrated a dispute of the fact as stated.

[2] Plaintiff contends that this fact is immaterial because he did not read the document and was not provided with a hard copy.  However, the Court finds that the fact that Plaintiff signed the document attesting that he had read and understood the documents is material in this action.

Code of Ethics or these other policies, laws and regulations constitute grounds for disciplinary action, including termination of employment and possible legal action. . . .[3]

4.      The Code of Ethics states, in part:

Section 3: Confidentiality and Information Security
You must keep the following information confidential and secure:
•        Customer Information –
         You may access customer information only for business purposes and must protect the confidentiality and security of the information at all times.
Section 4: Bank of America Assets
You must properly care for and protect Bank of America property and assets, which should be used for legitimate business purposes only.  You must not:
•        Use Bank of America assets for personal gain or advantage.

5.      Plaintiff received training on the Code of Ethics, including annual assessments which he always passed.  (Depo. of Troy Jacques 159:3-10.)

6.      Plaintiff knew that a violation of the Code of Ethics would lead to termination. (Depo. of Troy Jacques 159:17-22.)

7.      In late 2007, Defendant promoted Plaintiff to a Personal Banker.  (Depo. of Troy Jacques 31:9-32:12.)

8.      Plaintiff received general training during which he was instructed on how to open accounts.  (Depo. of Troy Jacques 37:24-39:17.)

9.      In March 2008, Plaintiff transferred to the Tower District branch reporting to Banking Center Manager, Danny Villacis ("Villacis").  (Depo. of Troy Jacques 36:15-17, 40:3-4.)

10.     Villacis reported to Bert Dodge ("Dodge) who was the Consumer Market Manager.  (Depo. of Danny Villacis 25:16-26:9; Depo. of Vince Martinez 105:2-3.)

11.     As a Personal Banker, Plaintiff assisted customers with opening savings, checking and debit accounts, lines of credit, and online banking.  (Depo. of Troy Jacques 35:6-11.)

12.     Plaintiff opened accounts which required verifying the customer's identity and contact information and choosing a username and a password.  (Depo. of Troy Jacques 75:23-

---

[3] The parties have not provided the Court with Bank of America's Code of Ethics; however, since the facts are undisputed, the Court includes the facts herein.

1   76:13.)

2       13.     The customer was required to produce two forms of identification, including his

3   or her telephone, date of birth, address, and social security number.  (Depo. of Troy Jacques

4   43:12-20.)

5       14.     Personal Bankers were taught to "up-sell" customers for a full package of

6   products which included checking, savings, debit card and online banking.   (Depo. of Troy

7   Jacques 45:1-11, 73:16-21.)

8       15.     Personal Bankers had sales goals and were eligible for quarterly bonuses.  (Depo.

9   of Troy Jacques 52:17-54:6, 55:2-19.)

10      16.     Plaintiff was entitled to a bonus if he "opened up a lot of accounts."  (Depo. of

11  Troy Jacques 52:17-54:6.)

12      17.     Villacis announced the sales goals.  (Decl. of Dilveer Atwall 23:4-16; Decl. of

13  Vince Hernandez 20:9-21:5, 60:13-25.)

14      18.     Plaintiff received training and understood that he was only allowed to look at a

15  customer's account for business purposes.  (Depo. of Troy Jacques 68:18-23.)

16      19.     For the Personal Banker to receive sales credit for an online account, the account

17  had to be accessed twice – once when the customer was enrolled and a second time to "activate"

18  the account.  (Depo. of Troy Jacques 79:14-15, 147:5-13; Depo. of Vince Hernandez 51:10-15,

19  22-54:2.)

20      20.     Accounts were "activated" by logging into the online banking account a second

21  time after the initial set up.  (Depo. of Troy Jacques 79:1-80:17.)

22      21.     Once the account was activated the customer could pay bills online.  (Depo. of

23  Troy Jacques 48:6-20.)

24      22.     Tellers collected the necessary information and Villacis passed the information on

25  to the Personal Bankers who were directed by him to set the online banking account up using a

26  generic password.  (Depo. of Troy Jacques 198:8-23, 204:22-205:5; Depo. of Vince Hernandez

27  51:10-52:16, 53:2-10.)

28      23.     Villacis provided temporary passwords to the Personal Bankers to use in setting

1  up the customer's account.  (Depo. of Vince Hernandez 51:7-52:16, 64:1-10.)

2      24.    Plaintiff had access to a specific computer and was required to utilize his Bank of

3  America issued ID and a password every time he logged into his computer terminal.  (Depo. of

4  Troy Jacques 46:4-19.)

5      25.    Plaintiff never shared his user ID or password with anyone at the Banking Center.

6  (Depo. of Troy Jacques 47:6-9, 51:2-12.)

7      26.    Documentation showed that Plaintiff was activating online banking accounts

8  outside of banking hours.  (Decl. of Rai Otero 134:18-136:8; Decl. of Laura Marie White 86:14-

9  88:10.)

10     27.    Plaintiff completed an on-line application with Wells Fargo Bank ("Wells Fargo")

11 on September 26, 2008.   In the question asking whether he had ever been "involuntarily

12 discharged or asked to resign from a position," Plaintiff marked "No."  (Depo. of Karen Gravelle

13 20:3-14; Wells Fargo Employment Application 3, attached as Exhibit G:1 to Depo of Karen

14 Gravelle.)

15     28.    As a participating subscriber and, as part of its background check, Wells Fargo

16 submitted an inquiry with EWS on behalf of Plaintiff on October 1, 2008.  (Depo. of David C.

17 Overlook 37:11-15.)

18     29.    EWS did not have a record of Plaintiff at the time and recommended that Wells

19 Fargo accept Plaintiff for employment.  (Depo. of David C. Overlook 37:9-13, 47:20-48:9.)

20     30.    Defendant had a national investigation regarding the opening of online banking

21 accounts involving pockets of fraud activity.  (Depo. of Ray Otero 48:6-49:4, 50:22-51:7.)

22     31.    In or about late September 2008, Laura White, Sr. Investigator with Defendant's

23 Global Financial Crimes Compliance, was assigned to investigate Plaintiff.  (Depo. of Laura

24 Marie White 50:16-20, 68:1-19, 86:10-23, 94:7-95:9; Depo. of Troy Jacques 58:3-25.)

25     32.    White has a bachelor's degree in criminology with a double minor in sociology

26 and psychology and a graduate degree in counseling psychology.  (Depo. of Laura Marie White

27 13:16-25.)

28     33.    Prior to joining Defendant in 1997, White was a detective and a police officer

with the City of Antioch for 11 years.  (Depo. of Laura Marie White 14:6-25.)

34.    As a senior investigator, White handled investigations related to suspected fraud, ethical issues, and potential criminal matters involving Bank employees.  (Depo. of Laura Marie White 25:16-25.)

35.    White was the person from corporate security assigned to investigate Plaintiff. (Depo. of Laura Marie White 49:25-50:2.)

36.    White was unaware that the investigation into Plaintiff was part of a country-wide investigation.  (Depo. of Laura Marie White 50:7-9.)

37.    Plaintiff had no previously interactions with White.  (Depo. of Troy Jacques 85:6-9.)

38.    On October 7, 2008, White interviewed Plaintiff for about 30 to 60 minutes at the market office.  (Depo. of Troy Jacques 58:4-60:9, 84:1-3.)

39.    The only persons in this meeting were White and Plaintiff.  (Depo. of Troy Jacques 58:3-20; Depo. of Laura Marie White 148:24-149:3.)

40.    Plaintiff first learned there was an issue with online activations on October 7, 2008, when he was interviewed by White.  (Depo. of Troy Jacques 56:9-19.)

41.    White told Plaintiff that he was being investigated for online banking activations. (Depo. of Troy Jacques 58:3-25.)

42.    White discussed with Plaintiff online activations that appeared on the activation spreadsheet which occurred before 9:00 a.m. prior to Defendant's business hours.  (Depo. of Troy Jacques 62:3-10.)

43.    Plaintiff admitted to using customer IDs and passwords when activating the accounts even when the customer was not present.  (Depo. of Troy Jacques 63:20-64:6, 66:18-67:67:10.)

44.    Plaintiff did not dispute the activity represented on the activation spreadsheet. (Depo. of Troy Jacques 66:16-67:10.)

45.    Plaintiff claimed that customers gave him permission to access their accounts outside their presence, however Plaintiff did not have any written consent from the customers.

1   (Depo. of Troy Jacques 68:15-22.)

2       46.    Since several customers whom Plaintiff enrolled in online banking accounts did

3   not have a computer at home and he did not know if they would ever return to the banking center

4   to activate their online account, Plaintiff would activate their account in their absence.  (Depo. of

5   Troy Jacques 203:1-12.)

6       47.    At the end of the investigation, Plaintiff prepared and signed a Voluntary

7   Statement, stating:

> It was a practice to make sure and sign customers up and disclose online banking and its features to them.  I was thought [sic] at training meetings how to pitch online banking and why it's easy to use.  Customers were told that their online banking would be free and there for them to use at any time, and they could come into the branch to pay all bills.  It was a practice to help them pay their bills, and help them understand what stuff is, on online banking (like check ordering, statements and copies of check, etc.).  We would help customers with this all the time.  I would help customers activate online banking so that it would be ready for their bills on the day they came in to pay.  [Customers] were informed it would be ready for them!

14  (Bank of America Investigative Services Voluntary Statement attached to August 15, 2016 Decl.

15  of Phillip Chan at Exhibit A:1.)

16      48.    This meeting was the only time that Plaintiff communicated with White.  (Depo.

17  of Troy Jacques 85:6-18.)

18      49.    White did not interview other employees of Defendant.  (Depo. of Laura Marie

19  White 92:18-21.)

20      50.    White concluded that Plaintiff falsified Bank documents when he pretended to be

21  a customer while activating the online banking accounts.  (Depo. of Laura Marie White 137:8-

22  19.)

23      51.    White concluded that Plaintiff improperly had access and knowledge of customer

24  passwords.  (Depo. of Laura Marie White 153:18-23.)

25      52.    White concluded that Plaintiff was activating online banking accounts to receive

26  incentive benefit.  (Depo. of Laura Marie White 154:14-155:3.)

27      53.    White recorded Defendant's loss as $0.00.  (Depo. of Laura Marie White 124:10-

28  126:2.)

54.   Whether a contribution should be made to EWS's Internal Fraud Prevention Services Database was left to White's sole discretion.  (Depo. of Laura Marie White 171:14-172:5.)

55.   White designated Plaintiff for submission to EWS by pressing the "radio button" on the on-line case management tool she utilized.  (Depo. of Laura Marie White 111:2-8; Depo. of Angela Cabrera 87:13-24.)

56.   White knew that Plaintiff would be terminated from Defendant as a result of her report.  (Depo. of Laura Marie White 133:15-134:5.)

57.   White did not note that the matter was submitted to the authorities and Plaintiff has never been charged with any fraud relating to the online activations.  (Depo. of Troy Jacques 197:18-25; EWS Information, attached as Exhibit D:3 to August 15, 2016 Decl. of Phillip Chan.)

58.   Plaintiff first announced his resignation when he was being interviewed by White on October 7, 2008.  (Depo. of Troy Jacques 85:6-18, 175:18-20.)

59.   On October 8, 2008, Wells Fargo prepared an offer letter for Plaintiff.  (Wells Fargo Letter dated October 8, 2016, attached as Exhibit A to July 25, 2016 Decl. of Phillip Chan.)

60.   On October 8, 2008, Dodge called Villacis and advised him that based on an internal investigation concerning online abuse, the Bank intended to terminate Plaintiff's employment.  (Depo. of Danny Villacis 71:24-72:15, 76:10-22.)

61.   Dodge instructed Villacis to contact Advice & Counsel, Defendant's human resources department, regarding Plaintiff's termination for online banking abuse.  (Depo. of Danny Villacis 56:7-19, 76:14-22.)

62.   Later the same day, Villacis called Advice & Counsel regarding Plaintiff's termination and requested the appropriate separation documents.  (Depo. of Danny Villacis 83:3-17; Decl. of Kim Norton ¶ 8; Advisory Services/Case Management Notes attached as Exhibit 2 to Decl. of Kim Norton.)

63.   Villacis was unaware of Plaintiff ever having committed any crime or violation of regulation at Bank of America.  (Depo. of Danny Villacis 57:18-58:18.)

64.     Villacis arranged for Plaintiff to visit the Tower Banking Center following his investigation because Plaintiff was not allowed on Defendant's premises.   (Depo. of Troy Jacques 22-25.)

65.     On October 9, 2008, Plaintiff met Villacis at the Tower District branch.   (Depo. of Troy Jacques 8:14-22, 86:2-22; Decl. of Danny Villacis ¶ 7.)

66.     Villacis gave Plaintiff his last pay check, Notice to Associate of Change in Status and a California State booklet informing Plaintiff of his rights to unemployment insurance benefits.   (Depo. of Danny Villacis 83:14-16; Decl. of Danny Villacis ¶ 7.)

67.     The Notice to Associate of Change in Status notes Plaintiff's discharge date of October 9, 2008.   (Notice to Associate of Change in Status, attached to Depo. of Danny Villacis.)

68.     Defendant electronically transmitted to EWS the data file regarding Plaintiff on October 22, 2008.   (Contributor Detail, attached as Exhibit D-2 to August 15, 2016 Decl. of Phillip Chan.)

69.     Defendant did not report to EWS any specific information regarding the event or provide a copy of the written voluntary statement or its proof.   (Depo. of David C. Overlook 55:4-10, 97:23-8.)

70.     Plaintiff testified that he later learned from a former coworker that Villacis told Plaintiff's colleagues that he terminated Plaintiff.   (Depo. of Troy Jacques 172:12-24, 173:3-5, 182:8-10.)

71.     Plaintiff testified that since the banking staff thought he was terminated, he felt humiliated at having to go the banking center.   (Depo. of Troy Jacques 182:13-23.)

72.     Plaintiff began employment with Wells Fargo on October 10, 2008.   (Depo. of Karen Gravelle 25:22-26:9; Wells Fargo Letter dated October 8, 2016, attached as Exhibit A to July 25, 2016 Decl. of Phillip Chan..)

73.     In February 2011, Wells Fargo subjected Plaintiff to a second background check in response to the Mortgage SAFE Act.   (Depo. of Troy Jacques 99:4-100:14; Depo. of Karen Gravelle 69:6-70:19; Telephonic Depo. of Debra Mitchell 16:11-24.)

74.     The Mortgage SAFE Act required a background check of any bank employee who

might be involved in a mortgage.  (Telephonic Depo. of Debra Mitchell 12:4-19, 13:12-14:1.)

75.     On February 2, 2011, First Advantage made an inquiry for Wells Fargo to the EWS Internal Fraud Prevention Services Database which resulted in identifying Plaintiff as having been terminated from Defendant for internal fraud supported by a written confession. (Depo. of Donald C. Overlock 49:9-50:9, 169:13-17.)

76.     The communication was not specific as to what "event" Plaintiff had committed nor did it provide what law was violated or provide the claimed confession.  (Depo. of Donald C. Overlock 55:4-10, 98:5-12.)

77.     In February 2011, Wells Fargo questioned Plaintiff about his employment with Wells Fargo and whether he had been terminated.  (Depo. of Troy Jacques 100:1-101:16.)

78.     Plaintiff assured Wells Fargo that he resigned and brought into Wells Fargo a letter of resignation he drafted on Bank of America letterhead.  (Depo. of Troy Jacques 102:13-23.)

79.     Plaintiff was placed on administrative leave by Wells Fargo pending an investigation.  (Depo. of Troy Jacques 105:21-25.)

80.     Wells Fargo terminated Plaintiff's employment on April 15, 2011.  (Depo. of Karen Gravelle 92:10-25.)

81.     Defendant's reporting to EWS disqualified Plaintiff from employment at Wells Fargo since it violated Wells Fargo's bond policy.  (Decl. of Karen Gravelle 90:13-24.)

82.     On October 5, 2011, Plaintiff filed a Notice of Dispute regarding his EWS record. (Depo. of Donald C. Overlock 61:13-63:22.)

83.     Jean Miller, Director of Global Financial Crimes Compliance, at Bank of America received Plaintiff's dispute and concluded that he should be retained in EWS.  (Depo. of Jean Miller 55:20-15, 59:9-60:11.)

84.     Jean Miller was White's boss and reviewed the file of White's investigation. (Depo. of Jean Miller 52:14-25.)

85.     Defendant has been a subscriber to EWS's Internal Fraud Prevention Services Database since 2007.  (Depo. of David C. Overlook 14:1-25.)

86.     EWS is a consumer reporting agency which offers databases to participating subscribers.  Specifically, financial institutions, such as Defendant, submit names of employees terminated for certain delineated conduct related to fraud.  The names are maintained in the EWS Internal Fraud Prevention Services Database which can be accessed by other subscribing institutions as part of their background screening process.  (Depo. of Donald C. Overlock 11:14-12:25, 15:7-47:18.)

87.     Defendant was a "contributor" to EWS's Internal Fraud Prevention Services Database in October of 2008.  (Depo. of David C. Overlook 13:1-15:17.)

88.     The purpose of the Internal Fraud Prevention Services Database was to alert users that a prospective employee was disqualified for employment.  (Depo. of David C. Overlook 17:12-16, 110:17-23.)

89.     The EWS Internal Fraud Prevention Services Operating Rules ("Operating Rules") provide that the following are some criteria that must be met for submission: [i] the employee must be a former employee; [ii] the employee must have been at least 18 years of age at the time of the incident; and [iii] an uncoerced oral confession or written admission of wrongdoing obtained from the employee or direct evidence of wrongdoing.  (Early Warning Sevices Internal Fraud Prevention service Operating Rules 3.2, attached at ECF No. 181-2 to August 22, 2016 Decl. of Alice Kokodis.)

90.     The Operating Rules defines event as: "The commission or attempted commissions of fraud, theft, or other activity listed in Section 3.2 by a released Employee at a Contributor."  (Early Warning Sevices Internal Fraud Prevention service Operating Rules 1.7, attached at ECF No. 181-2 to August 22, 2016 Decl. of Alice Kokodis.)

91.     Investigators are not required to identify or put in their case file which event was triggered by the employee's conduct.  (Depo. of Angela Cabrera 49:15-50:5.)

92.     Once marked for submission to EWS, Defendant creates an electronic data file that includes the employee's name, date of incident, social security number, residential address, as well as the investigation case number and date of monetary loss.  (EWS Information, attached as Exhibit D:3 to August 15, 2016 Decl. of Phillip Chan.)

93.     The terminated employee remains in the database for 83 months.  (Depo. of David C. Overlook 144:10-145:4.)

94.     In 2014, Plaintiff disputed his inclusion in the Internal Fraud Prevention Services Database a second time and there was a reinvestigation by Cabrera and two other executives in the security department.  (Depo of Angela Cabrera 33:6-20.)

95.     Cabrera relied on the written statement of Plaintiff and the investigation by White. (Depo of Angela Cabrera 3:10-40:1.)

96.     Cabrera reasoned that intent to commit fraud was a matter for the courts.  (Depo of Angela Cabrera 60-:22-25.)

97.     On August 7, 2015, the reporting period expired and Plaintiff was deleted from the EWS database.  (Depo. of Donald C. Overlock 145:1-17.)

98.     Bank of America's policy regarding Online Banking: Enrollment and Setup, states in part:

> • Important: For customer privacy and security reasons, do not setup a SiteKey for a customer using any banking center computer including Online Banking kiosks stations.
> • Customers must perform the following on a computer located outside of the banking center which they intend to use to access online banking:
> ₒ Initial Login (once Online Banking enrollment has been completed)
> ₒ Sitekey set up
> ₒ Confirm the "Go Paperless" suppression of paper communications if this option is chosen during enrollment.

(Online Banking: Enrollment and Setup 1, attached at ECF No. 181-1 to August 22, 2016 Decl. of Alice A. Kokodis.)

## III.

## LEGAL STANDARD

### A.     Motion for Summary Judgment

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case...." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp.</u>, 477 U.S. at 322.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001); <u>accord</u> <u>Simmons v. Navajo Cnty., Ariz.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

**B.     Defamation**

Defamation may occur by means of libel or slander. <u>Shively v. Bozanich</u>, 31 Cal.4th 1230, 1242 (2003), as modified (Dec. 22, 2003). "The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural

1    tendency to injure or that causes special damage.' " <u>Taus v. Loftus</u>, 40 Cal.4th 683, 720 (2007).

2    "Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred,

3    contempt, ridicule, or obloguy, or which causes him to be shunned or avoided, or which has a

4    tendency to injure him in his occupation." <u>Baker v. Los Angeles Herald Exam'r</u>, 42 Cal.3d 254,

5    259 (1986) (quoting Calif. Civ. Code, § 45).   "A false and unprivileged oral communication

6    attributing to a person specific misdeeds or certain unfavorable characteristics or qualities, or

7    uttering certain other derogatory statements regarding a person, constitutes slander." <u>Shively</u>, 31

8    Cal.4th at 1242.  Publication occurs when the defamatory statement is communicated to a third

9    person who understands the defamatory meaning of the statement as it applies to the plaintiff.

10   <u>Id.</u>

### C.       California Labor Code Section 1050

12        Under the California Labor Code "[a]ny person, or agent or officer thereof, who, after

13   having discharged an employee from the service of such person or after an employee has

14   voluntarily left such service, by any misrepresentation prevents or attempts to prevent the former

15   employee from obtaining employment, is guilty of a misdemeanor." Cal. Lab. Code § 1050.  "In

16   addition to and apart from the criminal penalty provided any person or agent or officer thereof,

17   who violates any provision of sections 1050 to 1052, inclusive, is liable to the party aggrieved, in

18   a civil action, for treble damages.  Such civil action may be brought by such aggrieved person or

19   his assigns, or successors in interest, without first establishing any criminal liability under this

20   article." Cal. Lab. Code § 1054.

### D.       Intentional Infliction of Emotional Distress

22        Under California law, the elements of intentional infliction of emotional distress are: "(1)

23   outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the

24   probability of causing emotional distress, (3) severe emotional suffering, and (4) actual and

25   proximate causation of the emotional distress." <u>Wong v. Tai Jing</u>, 189 Cal.App.4th 1354, 1376

26   (2010) (quoting <u>Agarwal v. Johnson</u>, 25 Cal.3d 932, 946 (1979)); <u>accord Yau v. Santa Margarita</u>

27   <u>Ford, Inc.</u>, 229 Cal.App.4th 144, 160 (2014).  Conduct is "outrageous if it is 'so extreme as to

28   exceed all bounds of that usually tolerated in a civilized community.'" <u>Simo v. Union of</u>

1  NeedleTrades, Industrial & Textile Employees, 322 F.3d 602, 622 (9th Cir. 2002) (quoting

2  Saridakis v. United Airlines, 166 F.3d 1272, 1278 (9th Cir. 1999)).

3        **E.**      **Negligent Infliction of Emotional Distress**

4        A claim of negligent infliction of emotional distress is not an independent tort but the tort

5  of negligence. Burgess v. Superior Court, 2 Cal.4th 1064, 1200 (1992). The traditional elements

6  of duty, breach of duty, causation and damages apply to claims that a defendant negligently

7  inflicted emotional distress. Wong, 189 Cal.App.4th at 1377. Plaintiff must prove that he

8  suffered serious emotional distress and that the defendant's negligence was a substantial factor in

9  causing the distress. California Civil Jury Instructions (CACI) 1620. Whether the defendant

10  owes a duty of care is a question of law which depends on the foreseeability of the risk and

11  weighing the policy considerations for and against the imposition of liability. Burgess, 2 Cal.4th

12  at 1200.

13        **F.**      **Interference with Contractual Relations**

14        "[I]n California, the law is settled that 'a stranger to a contract may be liable in tort for

15  intentionally interfering with the performance of the contract.' " Reeves v. Hanlon, 33 Cal.4th

16  1140, 1148 (2004) (quoting Pacific Gas & Electric Co. v. Bear Stearns & Co., 50 Cal.3d 1118,

17  1126 (1990)). In order to prevail on a claim for intentional interference with contractual

18  relations, plaintiff must prove "(1) the existence of a valid contract between the plaintiff and a

19  third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts

20  designed to induce a breach or disruption of the contractual relationship; (4) actual breach or

21  disruption of the contractual relationship; and (5) resulting damage." Reeves, 33 Cal.4th at 1148.

22  "[I]nterference with an existing contract receives greater solicitude than does interference with

23  prospective economic advantage" and therefore, "it is not necessary that the defendant's conduct

24  be wrongful apart from the interference with the contract itself." Quelimane Co. v. Stewart Title

25  Guar. Co., 19 Cal.4th 26, 55 (1998), as modified (Sept. 23, 1998)). The plaintiff need not prove

26  that the defendant's primary purpose in acting was to disrupt the contract, "but must show the

27  defendant's knowledge that the interference was certain or substantially certain to occur as a

28  result of his or her action." Reeves, 33 Cal.4th at 1148.

1    **G.    Breach of Covenant of Good Faith and Fair Dealing**

2    "Every contract imposes upon each party a duty of good faith and fair dealing in its

3    performance and its enforcement."  Foley v. Interactive Data Corp., 47 Cal.3d 654, 683 (1988)

4    (quoting Rest.2d Contracts, § 205)).  The burden that is imposed is " 'that neither party will do

5    anything which will injure the right of the other to receive the benefits of the agreement.' "

6    Careau & Co. v. Sec. Pac. Bus. Credit, Inc., 222 Cal. App. 3d 1371, 1393 (1990), as modified on

7    denial of reh'g (Oct. 31, 2001).  Since the covenant is a contract term, "compensation for its

8    breach has almost always been limited to contract rather than tort remedies."  Foley, 47 Cal.3d at

9    683.  "The covenant of good faith is read into contracts in order to protect the express covenants

10   or promises of the contract, not to protect some general public policy interest not directly tied to

11   the contract's purposes."  Id. at 690.  The California Supreme Court has held that contractual

12   remedies should remain the sole available relief for breaches of the the implied covenant of good

13   faith and fair dealing in the employment context.  Id. at 696.

14   **IV.**

15   **ANALYSIS**

16   Defendant argues that Plaintiff is unable to prevail on his defamation and blacklisting

17   claims in this action because no statement was false or defamatory and truth is an absolute

18   defense to the claims in this action.  Defendant contends that Plaintiff admitted to accessing

19   customer accounts outside the customer's presence in violation of Defendant's ethical rules to

20   obtain credit for customer accounts.  Defendant also asserts that the claims are barred by the

21   common interest privilege because the participating institutions share a common interest in

22   knowing if former employees may have caused or attempted to cause financial loss.  Defendants

23   further contend that Plaintiff cannot show actual malice so the common interest privilege bars

24   Plaintiff's claims.

25   Defendant further argues that California Workers' Compensation Act preempts Plaintiff's

26   emotional distress claims; and Plaintiff cannot show that Defendant's conduct rises to the level

27   of extreme and outrageous conduct nor can Plaintiff demonstrate that he suffered severe or

28   extreme emotional distress.  Defendant contends that Plaintiff cannot prove his interference with

1  contract claim because he has no evidence that Defendant intended to induce Wells Fargo to

2  terminate his employment when they reported him to EWS.

3        Defendant asserts that Plaintiff cannot prevail on his implied covenant of good faith and

4  fair dealing claim as he was an at will employee.  Defendant's position is that since Plaintiff

5  alleges that he resigned from Bank of America his claim must be based on the reporting of

6  Plaintiff to EWS.  Since Plaintiff admitted to accessing customer accounts in violation of the

7  ethical rules, the report to EWS was true.  Finally, Defendant argues that Plaintiff cannot show

8  that an officer, director or managing agent committed the wrongful act with oppression, fraud, or

9  malice so he cannot prevail on his punitive damages claim.

10        Plaintiff counters that by submitting his name to EWS, Defendant made three defamatory

11  statements.  Plaintiff argues that the common interest privilege does not apply since EWS's

12  operating rules limit the report to regulatory and statutory criminal violations supported by

13  required evidence.  Plaintiff's position is that since his conduct in this action was not criminal it

14  does not fall within the interest of EWS.  Further, Plaintiff argues that since there can be no

15  reasonable belief in the truth of the report, he can show Defendant acted with actual malice.

16        Plaintiff contends that his emotional distress claim is not preempted by California's

17  Workers' Compensation law because his claims arose after the employment relationship ended.

18  Plaintiff asserts that since the report to EWS caused Plaintiff to be terminated from his position

19  and unable to find work in banking, there is a material dispute to survive summary judgment.

20        Plaintiff counters that since Defendant knew that contributing his name to EWS would

21  interfere with his ability to be employed in the banking industry, Defendant's conduct could

22  reasonably be found to have been intended to interfere with his future employment.  Plaintiff

23  contends that since Plaintiff's employment relationship with Defendant was based on contract, it

24  was implied that Defendant could not use its control over Plaintiff to unfairly blacklist him.

25        Plaintiff argues that Defendant has not shown that Plaintiff cannot make a showing

26  regarding punitive damages.  Plaintiff argues that White was acting pursuant to established

27  corporate policy when she failed to investigate and comply with EWS's operating rules.  Since

28  corporate policy is set by management, Plaintiff contends that evidence exists by which a jury

1  could award punitive damages.

2  Defendant replies that Plaintiff cannot rely on the contract between Defendant and EWS

3  because he is not a party to the contract and a third party cannot bring a breach of contract claim

4  based on this contract.  Defendant argues that Plaintiff has failed to establish that White doubted

5  the truth of the information that she provided to EWS or that she recklessly disregarded

6  Plaintiff's rights.   Further, Defendant contends that whether White's investigation was

7  inadequate or if she violated the operating rules of EWS is not clear and convincing evidence of

8  malice to sustain a defamation claim.

9  Finally, Defendant contends that California's Workers' Compensation provision applies

10  where the injury is proximately caused by employment; and therefore, his claim for infliction of

11  emotional distress is preempted.

12  Since this is an action arising under diversity jurisdiction, California substantive law

13  applies to the state law claims.  <u>Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC</u>, 632

14  F.3d 1056, 1060 (9th Cir. 2011).

15  **A.    Request to Strike Plaintiff's Expert Testimony**

16  In support of his opposition to the motion for summary judgment, Plaintiff has submitted

17  the declarations of two expert witnesses.  Defendant moves to strike the expert declarations

18  arguing that the opinions expressed set forth legal conclusions or opinions and are beyond the

19  scope of expert testimony.

20  The Federal Rules of Civil Procedure provide that an expert may testify in the form of an

21  opinion if he is qualified by his knowledge, skill, experience, training, or education and

22  demonstrates the reliability of the testimony.  Fed. R. Evid. 702.  To be admissible expert

23  witness testimony must "help the trier of fact to understand the evidence or to determine a fact in

24  issue."  Fed. R. Evid. 702(a).  Additionally, "[a ]n opinion is not objectionable just because it

25  embraces an ultimate issue."  Fed. R. Evid. 407(a).  The advisory committee notes for Rule 704

26  state:

27  > Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule
> 403 provides for exclusion of evidence which wastes time.  These provisions

28  > afford ample assurances against the admission of opinions which would merely

tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.  They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.  Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.  McCormick § 12.

The Tenth Circuit considered this issue in <u>Specht v. Jensen</u>, 853 F.2d 805 (10th Cir. 1988).

> The committee's illustration establishes the starting point for analysis of admissibility by distinguishing between testimony on issues of law and testimony on ultimate facts.  While testimony on ultimate facts is authorized under Rule 704, the committee's comments emphasize that testimony on ultimate questions of law is not favored.  The basis for this distinction is that testimony on the ultimate factual questions aids the jury in reaching a verdict; testimony which articulates and applies the relevant law, however, circumvents the jury's decisionmaking function by telling it how to decide the case.

<u>Specht</u>, 853 F.2d at 808. "[A]n expert's testimony is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function.  However, when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed.  In no instance can a witness be permitted to define the law of the case." <u>Id.</u> at 809-10.

Plaintiff submits the declaration of Jeffrey T. Hammerschmidt who is an attorney specializing in the area of criminal law.  (ECF No. 165.)  Mr. Hammerschmidt offers testimony regarding the criminal element of the conduct of Plaintiff.  The objections to the testimony of Mr. Hammerschmidt were raised in the reply brief, and Plaintiff has not had the opportunity to address the issue of whether the testimony invades the province of the trier of fact.  Since the Court finds this testimony is not necessary to decide the instant motion, the Court declines to decide the issue on the current briefing.  The parties are advised that this issue will need to be raised and fully briefed in a motion in limine prior to trial.

Plaintiffs have also submitted the declaration of Mark Keppler.  (ECF No. 166.)  Mr. Keppler has experience in the area of human resource management, labor and employment law, and employee and industrial relations.  Defendant requests that this declaration be stricken because it also offers opinions that invade the province of the trier of fact.  The Court has

1   reviewed the declaration of Mark Keppler and finds that to the extent that he addresses the facts

2   of this action within the confines of human resource acceptable standard practices, the testimony

3   falls within the scope contemplated by Rule 702.   Therefore, Defendant's request to strike the

4   declaration of Mr. Keppler is denied.

5       The parties are advised that in addressing such issues in their motions in limine they shall

6   be required to identify the specific testimony that the party opposing the testimony finds to be

7   objectionable.

8       **B.    Defamation and Blacklisting**

9       Defendant moves for summary judgment on these claims on the ground that the

10  information reported to EWS was true, no false statement was made to EWS, and the common

11  interest privilege applies to communications between Defendant and EWS.

12      1.    <u>Truth of the Statement</u>

13      "California law permits the defense of substantial truth and would absolve a defendant

14  even if she cannot 'justify every word of the alleged defamatory matter; it is sufficient if the

15  substance of the charge be proved true, irrespective of slight inaccuracy in the details.' "

16  <u>GetFugu, Inc. v. Patton Boggs LLP</u>, 220 Cal.App.4th 141, 154 (2013) (quoting <u>Masson v. New</u>

17  <u>Yorker Magazine, Inc.</u>, 501 U.S. 496, 516–517 (1991).   "Minor inaccuracies do not amount to

18  falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' "

19  <u>GetFugu, Inc.</u>, 220 Cal.App.4th at 154 (quoting <u>Masson</u>, 501 U.S. at 517).

20      Documentation showed that Plaintiff was activating online banking accounts outside of

21  banking hours and Laura White was assigned to investigate Plaintiff in connection with the

22  online banking accounts.  (U.F. 26, 35.)  White informed Plaintiff that she was investigating him

23  for online banking activations and interviewed him for about 30 to 60 minutes on October 7,

24  2008.  (U.F. 38, 41.)   White discussed with Plaintiff that online activations appeared to be

25  occurring outside business hours.  (U.F. 42.)  Plaintiff admitted that he was using customer IDs

26  and passwords when activating accounts, even when the customer was not present.  (U.F. 43.)

27  Plaintiff claimed that the customers were giving him permission to access their accounts when

28  they were not present.  (U.F. 45.)  Since several customers whom Plaintiff enrolled in online

banking accounts did not have a computer at home and he did not know if they would ever return to the banking center to activate their online account, Plaintiff would activate their account in their absence.  (U.F. 46.)  Plaintiff signed a statement stating that he would help customers activate online banking so it would be ready for their bills on the day they came into the bank to pay.  (U.F. 47.)

After this investigation, White concluded that Plaintiff falsified Bank documents when he pretended to be a customer while activating the online banking accounts; improperly had access and knowledge of customer passwords; and was activating the online accounts to receive an incentive benefit.  (U.F. 50, 51, 52.)  White designated Plaintiff for submission to EWS.  (U.F. 55.)  Plaintiff's information was transmitted to EWS on October 22, 2008.  (U.F. 68.)

Defendant argues that the information reported to EWS is merely a string of data which included Plaintiff's name, social security number, address, incident date, and investigation number, all of which is true.  Plaintiff responds that by contributing his name to EWS Defendant made representations that he had committed a criminal act as a banker, the event was a criminal act in violation of a statute or regulation, and Defendant had a confession of wrong doing or overwhelming evidence of a crime.

The operating rules for EWS provide that a reportable event is "the commission or attempted commission of fraud, theft, or other activity listed in Section 3.2.  (U.F. 90.)  To submit an event, Defendant must have an uncoerced oral confession or written admission of wrongdoing obtained from the employee or direct evidence of wrongdoing. (U.F. 89.)

At the August 19, 2016 hearing, Defendant stated that the data inferred that Plaintiff had intended to defraud or there was evidence to reasonably believe there was evidence of intent to defraud Bank of America.  By reporting Plaintiff to EWS, a reasonable jury could conclude that submitting the data to EWS was a representation of facts about Plaintiff, that he had committed an event within the operating agreement.  "A defendant is liable for what is insinuated, as well as for what is stated explicitly."  Wong, 189 Cal.App.4th at 1372.  The Court finds that there is sufficient evidence by which a jury could determine that Defendant made a statement that Plaintiff had committed a qualifying event by submitting his information to EWS.

Defendant argues that Plaintiff prepared a voluntary statement in which he admits to activating accounts so they would be ready for customers to pay their bills when the customer returned to the banking center.  Here, White had conclusive evidence that Plaintiff was activating customer accounts outside business hours and without the customer being physically present. (U.F. 26, 43, 44, 45, 46.)  While Plaintiff now argues that he was activating the accounts while the customer was on the line, he told White that he activated the accounts without the customers being present.  (Depo. of Laura Marie White 96:14-19.)  White's investigative diary notes that Plaintiff admitted to activating online banking accounts without the customer being present and stated that no one instructed him in this activity.  (Investigator Diary, attached as Exhibit C:1 to August 15, 2016 Decl. of Phillip Chan.)  Plaintiff testified that he activated accounts outside the presence of the customers or with them on the phone.  (Depo. of Troy Jacques 63:3-64:6.)  When asked how many times he activated the account outside the presence of the customer versus how many times the accounts were activated with the customer on the phone, Plaintiff responded he did not know.  (Depo. of Troy Jacques 64:7-11.)  Further, Plaintiff testified that sometimes he called the customers to let them know that he had activated their accounts, but other times he did not.  (Depo. of Troy Jacques 64:22- 66:9.)  Plaintiff also testified that sometimes the online activations after the bank closed for the evening were done when the customer was not present. (Decl. of Troy Jacques 66:18-67:10.)  Plaintiff would call the customers to let them know he had activated their accounts if they had asked him to. (Decl. of Troy Jacques 68:23-69:4.)  The evidence does not support Plaintiff's argument that customers were always on the phone when he accessed the accounts outside their physical presence.

Plaintiff also argues that Defendant left finding intent to the Courts and therefore there is no evidence to support a mens rea requirement.  At her deposition, Ms. Cabrera was asked about Plaintiff's intent to defraud.  Ms. Cabrera responded, "We don't prove intent.  We look at the facts in their totality, and if we're not sure, we follow up with the investigator.  And in doing so, we believe that [White] made a reasonable decision at the time to submit to EWS based on his actions of signing up for online banking without proper authorization.  It's a gateway to identity theft."  (Depo. of Angela Cabrera 45:6-12.)

1    When asked if there was a concern regarding Plaintiff having access to customer funds,

2  Ms. Cabrera responded:

3       What often happens in times when individuals are signing -- employees are
        signing up customers for online banking or any additional products, they receive
4       production credits.  So the intent to defraud isn't so much – it's two-fold;
        potential identity theft, but also he would have received a production credit, a
5       benefit, a way to reach his incentive goals within the banking center channel by
        signing that up, even if the money wasn't in the account.
6
   (Depo. of Angela Cabrera 53:10-19.)  Ms. Cabrera later explained,
7
        So again, we as internal investigators don't prove intent.  We look to see him
8       accessing a computer without authorization.  And again, two-fold; it could be that
        he's looking to commit identity theft, it could be he's looking to meet his goal.
9
        In essence, that's perceived as a theft from the bank because he gets production
10      credits for that.  So the basic crime could be argued potentially a theft.  But again,
        that's the information that the facts guided us to in the investigation.
11

12   (Depo. of Angela Cabrera 58:14-24.)

13    Finally, when asked if anyone concluded that Plaintiff had accomplished theft by what he

14  did or if it was just potential, Ms. Cabrera proffered the testimony relied on by Plaintiff, "Yeah,

15  we don't prove intent.  That's for the criminal courts.  We identify based on her investigation

16  that she reasonably concluded that he intended to defraud the bank and potentially the

17  customers."  (Depo. of Angela Cabrera 60:22-61:1.)  Defendant believed they had evidence that

18  Plaintiff either intended to benefit himself by way of those production credits receiving an

19  incentive, or potential for identity theft.  (Depo. of Angela Cabrera 62:9-12, 70:3-7, 79:3-7.)

20    The question is whether the evidence was sufficient for White to reasonably believe that

21  Plaintiff intended to commit fraud by activating customer accounts to receive credit for the

22  online account.  Plaintiff argues that his conduct did not rise to the level of an event that should

23  have been reported to EWS.  Plaintiff asserts that he was instructed by Villacis to activate

24  customer accounts so that the account would be ready for the customer to use when they came

25  into the bank.  (Depo. of Troy Jacques 166:7-17, 167:14-21, 202:21-203:12.)  Villacis trained the

26  personal bankers to use a generic password and then after the client left to log in for the second

27  activation.  (Depo. of Vince Hernandez 52:25-53:9, 54:6-11.)  A reasonable juror could find that

28  Plaintiff was activating accounts as instructed by Villacis so that the account would be ready for

1    the customer rather than for the purpose of receiving an incentive credit.

2        A genuine issue of material fact exists as to whether Plaintiff was fraudulently activating

3    online accounts.  Accordingly, Defendant is not entitled to summary judgment based upon the

4    defense of truth or that no false statements were made to EWS.[4]

5        2.    Common Interest Privilege

6        Defendant contends that the statements are covered by the common interest privilege.

7    Under California law a common interest privilege provides a qualified privilege for defamatory

8    statements.

> In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information.  This subdivision applies to and includes a communication concerning the job performance or qualifications of an applicant for employment, based upon credible evidence, made without malice, by a current or former employer of the applicant to, and upon request of, one whom the employer reasonably believes is a prospective employer of the applicant. . . .

14   Cal. Civ. Code § 47(c).  The application of this provision is a question of law where the facts that

15   are alleged to give rise to the privilege are undisputed.  SDV/ACCI, Inc. v. AT & T Corp., 522

16   F.3d 955, 961 (9th Cir. 2008).

17       The party asserting the privilege has the burden of showing that the alleged defamatory

18   statement was made on a privileged occasion.  Taus, 40 Cal.4th at 721; SDV/ACCI, Inc., 522

19   F.3d at 961.  To be protected the communication must be reasonably calculated to further the

20   common interest.  SDV/ACCI, Inc., 522 F.3d at 962.  "The privilege may be lost if the defendant

21   abuses the privilege by excessive publication or the inclusion of immaterial matter which have

22   no bearing upon the interest sought to be protected.  Id. (internal punctuation and citations

23   omitted).

24       Here, the parties agree that "the malice necessary to defeat a qualified privilege is 'actual

25   malice' which is established by a showing that the publication was motivated by hatred or ill will

26   towards the plaintiff or by a showing that the defendant lacked reasonable ground for belief in

---

27

28   [4] Since the Court finds that there is a genuine issue of material fact as to whether the report was true, Defendant's arguments addressing the truth of the statement for the remaining claims shall not be addressed.

1  the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights."

2  Taus, 40 Cal.4th at 721.  "Thus the privilege is lost if the publication is motivated by hatred or ill

3  will toward plaintiff, or by any cause other than the desire to protect the interest for the

4  protection of which the privilege is given."  SDV/ACCI, Inc., 522 F.3d at 962 (quoting Cabanas

5  v. Gloodt Assocs., 942 F.Supp. 1295, 1301 n.7 (E.D.Cal.1996)).  The plaintiff bears the burden

6  of proving malice.  SDV/ACCI, Inc., 522 F.3d at 962.

7         a.      The statement falls within the common interest privilege

8         The common interest privilege protects statements made for a purpose advanced by the

9  privilege.  Stockton Newspapers, Inc. v. Superior Court, 206 Cal.App.3d 966, 979 n.3 (1988)

10  disapproved of on other grounds by Brown v. Kelly Broad. Co., 48 Cal.3d 711, (1989).  "This

11  privilege is 'recognized where the communicator and the recipient have a common interest and

12  the communication is of a kind reasonably calculated to protect or further that interest."  Hui v.

13  Sturbaum, 222 Cal.App.4th 1109, 1118 (2014).  The statutory interest applies where a defendant

14  "is protecting his own pecuniary or proprietary interest[;]" the "required 'relation' between the

15  parties to the communication is a contractual, business or similar relationship[;]' " and the

16  statement "must have been in the course of a business or professional relationship."  Kashian v.

17  Harriman, 98 Cal.App.4th 892, 914 (2002).  Defendant has the initial burden of demonstrating

18  that the privilege applies which is ordinarily a question of law for the court.  Hui, 222

19  Cal.App.4th at 1119.  Here, Defendant has demonstrated that the statement made, that Plaintiff

20  had engaged in fraudulent conduct, would fall within the common interest privilege.

21         Defendant was protecting its own pecuniary interests and the required relationship exists

22  between EWS and Defendant.  EWS is a consumer reporting agency which offers databases to

23  participating subscribers.  Specifically, financial institutions, such as Defendant, submit names of

24  employees terminated for certain delineated conduct related to fraud.  The names are maintained

25  in the EWS Internal Fraud Prevention Services Database which can be accessed by other

26  subscribing institutions as part of their background screening process.  (U.F. 86.)

27         The report was made within the course of the relationship.  Defendant has been a

28  subscriber to EWS's Internal Fraud Prevention Services Database since 2007.  (U.F. 85.)

Defendant was a "contributor" to EWS's Internal Fraud Prevention Services Database in October of 2008. (U.F. 87.)  The purpose of the Internal Fraud Prevention Services Database was to alert users that a prospective employee was disqualified for employment.  (U.F. 88.)  After her investigation, White concluded that Plaintiff had falsified bank documents when he pretended to be a customer while activating online banking accounts, improperly had access and knowledge of customer passwords, and was activating online banking accounts to receive an incentive benefit. (U.F. 50, 51, 52.)

Plaintiff argues that since the conduct does not fall within the offenses included in the Operating Rules the common interest privilege should not apply.[5]  While Plaintiff argues that Plaintiff was merely violating internal policies which would not be reportable conduct, White concluded that Plaintiff was fraudulently activating customer online banking accounts to receive credit for the account in order to obtain a personal benefit.  This would be conduct which would fall within the purposes advanced by the privilege.  Here, the conduct was reported to EWS so other member institutions would be advised that Plaintiff was disqualified for employment which is the purpose of reporting.  Defendant has met its burden of demonstrating that the statement falls within the common interest privilege.   Therefore the burden shifts to Plaintiff to demonstrate that the statement was made with malice.  Hui, 222 Cal.App.4th at 1119.

### b.    Malice

A plaintiff can defeat the privilege by showing that the defendant did not have reasonable grounds for believing that the statement was true.  SDV/ACCI, Inc., 522 F.3d at 964.  However, mere negligence in making a sufficient inquiry into the facts on which the statement is made does not relinquish the privilege.  Rollenhagen v. City of Orange, 116 Cal.App. 3d 414, 423 (1981) disapproved of on other grounds by Brown, 48 Cal.3d 711 (1989); Vackar v. Package Machinery Co., 841 F.Supp.310, 314 (N.D. Cal. 1993).  "[M]ere negligence in investigation of

---

[5] Plaintiff also argues that section 47 provides that the report must be made based upon credible evidence.  However, California courts have found that this was intended to bar any argument that the common interest privilege would protect reports that were based on mere rumor or unfounded gossip.  Noel v. River Hills Wilson's Inc., 113 Cal.App.4th 1363, 1376 (2003).  In this case, White's report was not based on rumor or gossip but on evidence that Plaintiff was accessing online banking accounts outside the presence of the customers and his admissions that he had done so.

1  the facts, in the sense of oversight or unintentional error, is not alone enough to constitute

2  malice.  It is only when the negligence amounts to a reckless or wanton disregard for the truth, so

3  as to reasonably imply a wilful disregard for or avoidance of accuracy, that malice is shown."

4  Rollenhagen, 116 Cal.App.3d at 424.

5       [T]he publisher of a defamatory statement acts with reckless disregard amounting to

6  actual malice if, at the time of publication, the publisher 'in fact entertained serious doubts as to

7  the truth of his publication.' "  Khawar v. Globe Int'l, Inc., 19 Cal.4th 254, 262 (1998), as

8  modified (Dec. 22, 1998) (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)).  "To

9  prove actual malice, therefore, a plaintiff must demonstrate with clear and convincing evidence

10  that the defendant realized that his statement was false or that he subjectively entertained serious

11  doubts as to the truth of his statement."  Khawar, 19 Cal.4th at 275 (internal punctuation and

12  citation omitted); see also Manzari v. Associated Newspapers Ltd., __ F.3d. __, 2016 WL

13  3974178, at *6 (9th Cir. July 25, 2016) (actual malice requires the plaintiff to prove by clear and

14  convincing evidence that the statement was published with knowledge that it was false or with

15  reckless disregard as to whether the statement was false or not).  To prove this mental state, a

16  plaintiff may rely on circumstantial evidence, including evidence of motive and the failure to

17  adhere to professional standards.  Khawar, 19 Cal.4th at 275.  However, "reckless conduct is not

18  measured by whether a reasonably prudent man would have published, or would have

19  investigated before publishing.  There must be sufficient evidence to permit the conclusion that

20  the defendant in fact entertained serious doubts as to the truth of his publication."  Manzari, 2016

21  WL 3974178 at *7.

22       i.    Initial Report to EWS

23       Defendant argues that absent malice the common interest privilege absolutely protects

24  Defendant's report to EWS and bars the defamation claim.  Plaintiff responds that actual malice

25  has been shown to exist because the contribution was made after a recklessly inadequate

26  investigation; without knowledge of the elements required by EWS; with knowledge there was

27  no evidence of criminal or statutory violations in the written admission; without the requirement

28  that there be two witnesses to an admission; and for conduct that other employees were warned

and not fired.

The Court finds that much of Plaintiff's argument has no bearing on whether White believed that her report to EWS was true. "It is not sufficient to show that the statements . . . were inaccurate, or even unreasonable.  Only wilful falsity or recklessness will suffice.  'It is only when the negligence amounts to a reckless or wanton disregard for the truth, so as to reasonably imply a wilful disregard for or avoidance of accuracy, that malice is shown.' Kashian, 98 Cal.App.4th at 931 (citations omitted).

In support of the argument that the investigation was reckless, Plaintiff proffers the declaration of Mark J. Keppler.  (ECF No. 166.)  Mr. Keppler is a professor of Human Resources Management at Fresno State University specializing in the area of human resource management, labor and employment law, and employee and industrial relations.  (Decl. of Mark J. Keppler at ¶ 2.)  Mr. Keppler is experienced in arbitrating and mediating labor disputes and testifies as an expert in human resources management including workplace investigations, policies and procedures, training, disciplinary procedures, terminations, and related subjects.  (Id. at ¶¶ 3, 4.)

As the Court finds relevant to the issue addressed here, Mr. Keppler opines that White failed to question the manager of the branch or other employees even though Plaintiff's statement indicated that it was a practice at the branch to help customers pay their bills on time and they would help customers with this all the time.  (Decl. of Mark Keppler at ¶ 8(E); U.F. 47.) White recorded her investigation notes two weeks after the interview and included that he orally admitted that no one told him to sign up and activate accounts in this manner.  (Decl. of Mark Keppler at ¶ 8(G)).  Plaintiff denies that he made this statement and it would be inconsistent with the testimony of Hernandez and Atwall.  (Id.)  Further, Mr. Keppler opined that given the critical nature of this admission its inclusion in the final report submitted two weeks after her investigation is highly suspicious and creates serious questions as to it accuracy.  (Decl. of Mark Keppler at ¶ 8(J)).

In this instance, White only conducted an interview of Plaintiff and, while she recorded that he told her no one instructed him to activate accounts in the manner he was doing, Plaintiff stated that he told her that he was trained to open up the accounts for the customer and activate it

1  with their approval.   (Decl. of Troy Jacques 60:1-9.)   Mere negligence in conducting an

2  investigation is not enough to show malice.   Rollenhagen, 116 Cal.App.3d at 424.   "It is only

3  when the negligence amounts to a reckless or wanton disregard for the truth, so as to reasonably

4  imply a wilful disregard for or avoidance of accuracy, that malice is shown."   Id.

5        In his declaration, Mr. Keppler states that Plaintiff denies telling White that no one

6  instructed him to activate accounts outside the customer's presence.   The parties do not cite to

7  any evidence that Plaintiff denies making this statement to White.   Rather, Plaintiff relies on his

8  deposition testimony that Villacis instructed him to activate customer accounts and the testimony

9  of former coworkers taken after this case was filed that Villacis instructed personal bankers to

10 use a generic password.   However, this does not address what White knew at the time that she

11 made the decision to report Plaintiff to EWS.

12       Plaintiff contends that the inference from his voluntary "written statement" is that he

13 received such training by which White should have known that further investigation was

14 necessary.   Defendant argues that even if Plaintiff had been instructed by his manager to activate

15 customer accounts so that the branch would receive credit for the account that does not negate

16 the evidence of fraud.   Defendant contends that if that occurred then he and his manager both

17 engaged in fraudulent conduct and both should have been terminated.

18       During her deposition, White testified that she believed Plaintiff told her that no one

19 instructed him in this activity.   (Depo. of Laura White 102:22-103:3.)   However, White also

20 testified that does not remember the interview with Plaintiff.   (Depo. of Laura White 149:4-8.)

21 Upon review of her deposition testimony, White generally responded that she did not recall or

22 referred to her general practice when asked specific questions regarding what occurred in

23 relation to Plaintiff's investigation.   Whether White knew or should have known from Plaintiff's

24 interview that he claimed to be acting on the instruction of his manager in activating accounts

25 could be relevant to whether Plaintiff was engaged in fraudulent conduct or was just following

26 branch policy without the intent to defraud.

27       In this instance, Plaintiff has submitted evidence to establish that a genuine issue of

28 triable fact exists as to whether White conducted a sufficient investigation to have a reasonable

1  ground to believe that he engaged in fraudulent conduct as reported to EWS.

2      ii.    <u>Republication</u>

3      Plaintiff argues that in 2011 and 2014, Defendant republished the defamatory statements

4  by ratifying the original contribution.  "In general, the repetition by a new party of another

5  person's earlier defamatory remark also gives rise to a separate cause of action for defamation

6  against the original defamer, when the repetition was reasonably foreseeable."  <u>Shively</u>, 31

7  Cal.4th at 1243.  It is the state of mind of the republisher that is relevant to determine if they are

8  entitled to the privilege.  <u>Vackar</u>, 841 F.Supp. at 314.

9      Plaintiff contends that the republication was done with malice because the "re-

10  investigators" did not look at any evidence except Plaintiff's written statement and verbal

11  statements made to them by White, and the disputes were denied without considering that the

12  conduct did not violate a statute or regulation.  Defendant does not address the republication of

13  the statements due to the 2011 and 2014 disputes.  Accordingly, the Court finds that Plaintiff has

14  demonstrated that a genuine issue of material fact exists as to whether the denial of the dispute

15  was done with malice and therefore would not be protected by the common interest privilege.

16      Defendant's motion for summary judgment on the blacklisting and defamation claims is

17  denied.

18      **C.**    **Intentional Infliction of Emotional Distress**

19      Defendant moves for summary judgment on the emotional distress claims arguing that

20  the exclusive remedy provision of California's Workers' Compensation Act preempts, and

21  therefore bars, the emotional distress claims; and Plaintiff cannot demonstrate that he was

22  subjected to extreme and outrageous conduct or that he suffered severe emotional distress.

23  Plaintiff counters that since the defamation occurred after the employment relationship ended,

24  the Workers' Compensation Act does not preempt his claims, and he has presented evidence to

25  create a genuine issue of material fact as to Defendant's conduct and his emotional distress

26  damages.

27      The Court first considers whether Plaintiff's emotional distress claims are preempted by

28  California's Workers' Compensation Act.  Physical and emotional injuries that are sustained in

the course of employment are preempted by California's Workers' Compensation scheme and will therefore generally not support an independent cause of action. <u>Miklosy v. Regents of Univ. of California</u>, 44 Cal.4th 876, 902 (2008); <u>Yau</u>, 229 Cal.App.4th at 161. This includes emotional injuries resulting from workplace discipline or termination. <u>Yau</u>, 229 Cal.App.4th at 161. "An employer's intentional misconduct in connection with actions that are a normal part of the employment relationship . . . resulting in emotional injury is considered to be encompassed within the compensation bargain, even if the misconduct could be characterized as 'manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance.' " <u>Vasquez v. Franklin Mgmt. Real Estate Fund, Inc.</u>, 222 Cal. App. 4th 819, 833 (2013).

In <u>Livitsanos v. Superior Court</u>, 2 Cal.4th 744 (1992), the California Supreme Court held that that "claims for intentional or negligent infliction of emotional distress are preempted by the exclusivity provisions of the workers' compensation law, notwithstanding the absence of any compensable physical disability." <u>Livitsanos</u>, 2 Cal.4th at 747. In <u>Livitsanos</u>, the plaintiff began working for a yogurt manufacturer in the distributing department and was eventually promoted to general manager. Around 1984, plaintiff and another employee formed a company exclusively to distribute the products of the former employer. <u>Id.</u> at 747-48. During the plaintiff's employment he was praised by his employer for his performance and he operated the distributorship with the full knowledge and approval of the former employer. <u>Id.</u> at 748. For no apparent reason, in 1988 or 1989, the employer began a campaign of harassment against the plaintiff, falsely accusing him of writing fraudulent checks, implying that the plaintiff had stolen $800,000.00 from the company and threatening to have the plaintiff thrown in jail due to the missing money. <u>Id.</u> While the plaintiff was on vacation in April 1989, the employer told other employees that plaintiff had given himself an unauthorized pay raise, implied that the plaintiff had stolen money from the company, and that the plaintiff was trying to sabotage the company by telling employees to put less fruit in the yogurt. <u>Id.</u> Plaintiff was terminated from his employment. <u>Id.</u> After he was terminated, the former employer told other employees that plaintiff's company had been improperly buying fruit toppings to resell with the company's money, that the plaintiff had stolen $800,000.00 and was blackmailing the employer. <u>Id.</u> All

1    these statements were false.  Id.

2          The Livitsanos court considered the plaintiff's claims for breach of contract, defamation,

3    intentional infliction of emotional distress, negligent infliction of emotional distress, and money

4    lent.  Livitsanos, 2 Cal.4th at 748.  The court considered that "[t]he touchstone of the workers'

5    compensation system is industrial injury which results in occupational disability or death."  Id..

6    at 752.  "[T]he workers' compensation system is designed to compensate only for such disability

7    or need for treatment as is occupationally related."  Id. at 753.  The court found that compensable

8    injuries may be physical or emotion as long as they are disabling.  Id.  Therefore, "[s]o long as

9    the basic conditions of compensation are otherwise satisfied, and the employer's conduct neither

10   contravenes fundamental public policy nor exceeds the risks inherent in the employment

11   relationship, an employee's emotional distress injuries are subsumed under the exclusive remedy

12   provisions of workers' compensation."  Id. at 754 (internal citations omitted).

13         Plaintiff cites to dicta in Davaris v. Cubaleski, 12 Cal.App.4th 1583 (1993) to support his

14   contention that his infliction of emotional distress claims are not preempted.  In discussing

15   whether plaintiff's emotional distress claims were preempted by California's Workers'

16   Compensation Act, the Davaris court stated "[w]e note, initially, that certain of the allegedly

17   defamatory statements made by respondent (accusing appellant of stealing $800,000) were made

18   after appellant was terminated and can, by no stretch, be deemed to have occurred in the course

19   and scope of appellant's employment."  Davaris, 12 Cal.App.4th at 1587-88.  The court noted

20   that "defamatory statements which have no other purpose than to damage an employee's

21   reputation are neither a 'normal part of the employment relationship' nor a risk of employment

22   within the exclusivity provision of the Workers' Compensation Act."  Id. at 1591.

23         The parties have not cited, nor does the Court find a case presenting a similar situation to

24   that confronted here.  The California Supreme Court has rejected an employee's argument that

25   an action for intentional infliction of emotional distress should be permitted where the tortuous

26   conduct of the employer aggravated a compensable injury.  Cole v. Fair Oaks Fire Protection

27   Dist., 43 Cal.3d 148, 159 (1987).  The Court concluded that

28         when the misconduct attributed to the employer is actions which are a normal part

of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance resulting in disability.  The basis of compensation and the exclusive remedy provisions is an injury sustained and arising out of the course of employment (former Lab. Code, §§ 3600, 3601), and then the essence of the wrong is personal physical injury or death, the action is barred by the exclusiveness clause no matter what its name or technical form if the usual conditions of coverage are satisfied.

Cole, 43 Cal.3d at 160.

Here, the report to EWS was based upon the investigation into Plaintiff's actions while he was employed by Defendant and was conducted during his employment with Defendant.  A report to EWS for fraudulent conduct would be a normal part of the employment relationship at issue here.  Further, even if White intentionally misreported Plaintiff to EWS, Workers' Compensation would be the exclusive remedy for his infliction of emotional distress claims. Cole, 43 Cal.3d at 159; Miklosy, 44 Cal.4th at 902.

At the August 19, 2016 hearing, Plaintiff argued that the emotional distress he suffered from the 2011 republishing of the statement is not compensable under the Workers' Compensation Act.  Plaintiff contended that his emotional distress resulted from being terminated from Wells Fargo which occurred after he was no longer employed by Wells Fargo. The Court notes that in Davaris, while the Court found that some of the defamatory statements were made after termination, it still found that the intentional infliction of emotional distress claim was preempted by the Workers' Compensation Act.  Davaris, 12 Cal.App.4th at 1588, 1591.  If, as Plaintiff argues, the emotional distress he suffered years later due to Bank of America reporting his conduct during his employment to EWS entitles him to seek emotional distress damages it would negate the holding of Livitsanos.  The Court can conceive of many instances in which an employee suffers an adverse employment action that could result in negative consequences, including termination by another employer at a later date, and could lead to allegations of emotional distress.  As Livitasanos held, "[s]o long as the basic conditions of compensation are otherwise satisfied, and the employer's conduct neither contravenes fundamental public policy nor exceeds the risks inherent in the employment relationship, an

1   employee's emotional distress injuries are subsumed under the exclusive remedy provisions of

2   workers' compensation." Livitsanos, 2 Cal.4th at 754.

3        The Court finds that in the circumstances presented here, California's Workers'

4   Compensation Act would be the exclusive remedy for Plaintiff's infliction of emotional distress

5   claims based on Defendant reporting him to EWS.   Accordingly, Defendant's motion for

6   summary judgment on the emotional distress claims is granted.[6]

7        **D.      Interference with Contractual Relations**

8        Defendant argues that Plaintiff cannot meet the elements to prove a claim for interference

9   with contractual relations because Defendant had no knowledge that Plaintiff had taken a job

10  with Wells Fargo.  Plaintiff counters that there is evidence that Defendant's employees knew that

11  reporting Plaintiff to EWS would adversely affect his ability to be employed in the banking

12  industry and particularly with respect to EWS subscribers.

13       Interference with contractual relations does not require that the party act with the intent to

14  interfere with the contract.   Quelimane Co., 19 Cal.4th at 56.   Interference with contractual

15  relations can be shown where the the defendant "knows that the interference is certain or

16  substantially certain to occur as a result of his action." Id.

17       While Plaintiff argues that Defendant knew that contributing his name to the Internal

18  Fraud Protection Database would adversely affect his employability in the banking industry, the

19  defendant's knowledge of the contract alleged to have been interfered with is an element of a

20  claim for interference with contractual relations. Pac. Gas & Elec. Co., 50 Cal.3d at 1126.  "The

21  tort of interference with prospective economic advantage protects the same interest in stable

22  economic relationships as does the tort of interference with contract, though interference with

23  prospective advantage does not require proof of a legally binding contract." Id.  "If a potential

24  defendant was completely unaware of contractual relations with a third party, then it would be

25  impossible to infer any intent to interfere on the defendant's part.  However, such intent can

26  certainly be inferred if the defendant knows that contractual relations with a third party exist, but

27  _____

28  [6] Since the Court finds that the emotional distress claims are preempted by California's Workers Compensation Act it declines to address the arguments regarding the elements of an emotional distress claim.

1    does not know the specific identity of the contractual party." <u>Sebastian Int'l, Inc. v. Russolillo</u>,

2    162 F. Supp. 2d 1198, 1204 (C.D. Cal. 2001).

3        The Court only finds a few references in the record to Bank America's knowledge of

4    Plaintiff's future job prior to the date that the initial report was made to EWS.   During his

5    deposition, Plaintiff was asked about his meeting with White and if he had met or spoken with

6    her on any other occasion.  (Depo. of Troy Jacques at 85:6-11.)  Plaintiff responded, "No.  After

7    our - - she told me - - after our - - this, and I told her I was quitting because I already had another

8    job.  She said I would never - - I wouldn't have to worry about this anymore."  (Depo. of Troy

9    Jacques at 85:12-15.)  When asked whether Villacis inquired as to why Plaintiff was resigning,

10   Plaintiff stated, "I said I have another job and I made it a point to not tell him where I was going

11   to work. . . ." (Depo. of Troy Jacques at 87:2-3.)  When Villacis asked where Plaintiff was going

12   to work Plaintiff made a point not to tell him where he was going to work and "said I'm working

13   with a friend." (Depo. of Troy Jacques at 87:15-23.)  Plaintiff's comments to White and Villacis

14   where insufficient to provide notice that that his new position was in the banking industry, much

15   less that he was going to be employed with Wells Fargo.

16       Plaintiff has presented no evidence to show that Defendant was aware of his contract with

17   Wells Fargo or that he was going to work in the financial industry at the time that his information

18   was submitted to EWS.  Absent such knowledge by Bank of America, Plaintiff cannot prove that

19   Defendant intended to interfere with his contract with Wells Fargo by reporting him to EWS.

20       Plaintiff has not met his burden of demonstrating that a genuine issue of material fact

21   exists; and Defendant's motion for summary judgment on the interference with contractual

22   relations claim is granted.

23       **E.        Breach of Implied Covenant of Good Faith and Fair Dealing**

24       Defendant argues that Plaintiff cannot sustain a claim for breach of the implied covenant

25   and fair dealing because he was an at will employee.  Plaintiff responds that the covenant is

26   implied by law in every contract; and Defendant had an implied obligation not to unfairly

27   blacklist Plaintiff.

28       In <u>Guz v. Bechtel Nat. Inc.</u>, 24 Cal.4th 317 (2000), the California Supreme Court held

1   that

> while the implied covenant requires mutual fairness in applying a contract's
> actual terms, it cannot substantively alter those terms.  If an employment is at
> will, and thus allows either party to terminate for any or no reason, the implied
> covenant cannot decree otherwise.  Moreover, although any breach of the actual
> terms of an employment contract also violates the implied covenant, the measure
> of damages for such a breach remains solely contractual.  Hence, where breach of
> an actual term is alleged, a separate implied covenant claim, based on the same
> breach, is superfluous.  On the other hand, where an implied covenant claim
> alleges a breach of obligations beyond the agreement's actual terms, it is invalid.

Guz, 24 Cal.4th at 327.  Here, Plaintiff is not alleging a breach of the implied covenant of good faith and fair dealing due to wrongful termination, but alleges that Defendant had an implied duty not to use its control over the employment relationship to unfairly blacklist him.  Plaintiff provides no authority recognizing such a claim.

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made."  Guz, 24 Cal.4th at 349.  The implied covenant cannot have an existence independent of its contractual underpinnings and "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."  Id.  Plaintiff seeks to impose the covenant of good faith and fair dealing on the employment relationship to prevent an employer from doing something to disadvantage the employee's future employment opportunity.  However, Plaintiff has presented no evidence that the parties had such an agreement.  While there may be public policy reasons to allow such a recovery, this is the purpose of tort damages, Foley, 47 Cal.3d at 684, and a tort action for breach of the implied covenant of good faith and fair dealing in an employment relationship is not recognized in California.  Schneider v. TRW, Inc., 938 F.2d 986, 991 (9th Cir. 1991).

The cases upon which Plaintiff relies do not direct a different result.  Plaintiff cites Durell v. Sharp Healthcare, 183 Cal.App.4th 1350, 1361 (2010), which states the "covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement.  Durell, 183 Cal.App.4th at 1369.  Durell did recognize that there are limited contexts in which a

1   breach of the covenant gives rise to a contract action.  Id. at 1369.  This limited recognition is in

2   the context of insurance actions due to the special relationship between an insurer and insured.

3   Foley, 47 Cal.3d at 684;  Kransco v. Am. Empire Surplus Lines Ins. Co., 23 Cal.4th 390, 400

4   (2000), as modified (July 26, 2000).

5       Nor does Racine & Laramie, Ltd. v. Dep't of Parks & Recreation, 11 Cal.App.4th 1026,

6   1033 (1992), reh'g denied and opinion modified (Jan. 6, 1993), as modified on denial of reh'g

7   (Mar. 25, 1993), compel a different result.   In Racine, the plaintiff was arguing once a

8   negotiation has been undertaken there is an obligation implied in law to negotiate in good faith.

9   Id. at 1032.  "The implied covenant of good faith and fair dealing rests upon the existence of

10  some specific contractual obligation."  Id. at 1031.  The court found that while the parties could

11  take actions that would impose a duty to bargain in good faith, absent the existence of such

12  special circumstances or conditions, there is no obligation in California to bargain for a new or

13  amended contract in good faith.  Id. at 1035.

14      "The covenant of good faith is read into contracts in order to protect the express

15  covenants or promises of the contract, not to protect some general public policy interest not

16  directly tied to the contract's purposes."  Careau, 222 Cal.App.3d at 1393 (quoting Foley, 47

17  Cal.3d at 690).  For this reason, a breach of the implied covenant will always result in a breach of

18  contract.  Careau, 222 Cal.App.3d at 1939.  In this instance, Plaintiff has presented no evidence

19  that the parties' employment contract contained an express term that would address the conduct

20  at issue here.

21      While Plaintiff argued at the August 19, 2016 hearing that there were investigative

22  procedures that should have been followed in order to prevent an erroneous report to EWS, there

23  is no evidence in the record that Plaintiff's employment agreement included any terms regarding

24  investigation into alleged misconduct.  While there are situations in which the court will imply

25  terms of the employment agreement due to the actions of the employer, Foley, 47 Cal.3d at 677,

26  there is no evidence here that Plaintiff was aware of, was provided with, or relied on the

27  procedures for conducting investigations during his employment with Bank of America.  The

28  "implied covenant of good faith and fair dealing is limited to assuring compliance with the

1    express terms of the contract, and cannot be extended to create obligations not contemplated by

2    the contract." McKenna v. Permanente Medical Group, Inc., 894 F.Supp.2d 1258, 1271 (E.D.

3    Cal. 2012) (citations omitted).  Plaintiff has failed to establish that a genuine issue of material

4    fact exists as to this claim.  Defendant's motion for summary judgment on breach of the implied

5    covenant of good faith and fair dealing is granted.

6          **F.**    **Punitive Damages**

7          Defendant argues that punitive damages are precluded because Plaintiff has not shown

8    that any managing agent committed, ratified, authorized or participated in the tort as required by

9    California Civil Code section 3294.  Plaintiff counters that White was acting pursuant to

10   Defendant's policy, and the individuals involved in the 2011 and 2014 actions were managing

11   agents.

12         California law provides that an employer is not liable for punitive damages based upon

13   the acts of an employee, "unless the employer had advance knowledge of the unfitness of the

14   employee and employed him or her with a conscious disregard of the rights or safety of others or

15   authorized or ratified the wrongful conduct for which the damages are awarded or was personally

16   guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294(b).  Further, the statute requires

17   that in an action for punitive damages against a corporate employer, "the advance knowledge and

18   conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on

19   the part of an officer, director, or managing agent of the corporation."  Cal. Civ. Code § 3294(b).

20         California requires an officer, director or managing agent to be someone who exercises

21   substantial discretion authority over decisions that ultimately determine corporate policy.  Roby

22   v. McKesson Corp., 47 Cal.4th 686, 714 (2009); see also White v. Ultramar, Inc., 21 Cal.4th

23   563, 569 (1999) (a corporation's principal liability for punitive damages not depend on

24   employees' managerial level, but on the extent to which they exercise substantial discretionary

25   authority over decisions that ultimately determine corporate policy).  Similarly, " '[m]anaging

26   agents' are 'those corporate employees who exercise substantial independent authority and

27   judgment in their corporate decision-making so that their decisions ultimately determine

28   corporate policy.' "  Taylor v. Trees, Inc., 58 F.Supp.3d 1092, 1105 (E.D. Cal. 2014) (quoting

White, 21 Cal.4th at 566–67. " 'Corporate policies' are generally viewed as the 'general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations.' " Taylor, 58 F.Supp.3d at 1105 (quoting Cruz v. HomeBase, 83 Cal.App.4th 160, 167 (2000)).

Plaintiff argues that Defendants have not provided evidence to show that Plaintiff cannot make a showing that any managing agent was involved in the actions alleged in this action. However, Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 323). Defendant asserts that there is no evidence that any officer, director, or managing director acted with oppression, fraud, or malice against Plaintiff. Defendant is not required to present evidence to prove that the individuals are not managing agents. Defendant has met its burden to demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 322. Therefore, the burden shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co., 475 U.S. at 586.

Plaintiff argues that the individuals involved in the 2011 and 2014 actions involving disputes were managing agents. Plaintiff contends that Miller was in charge of numerous investigators; Cabrera was a Director of Corporate Compliance and she reviewed the dispute with two other directors who ratified White's reporting of Plaintiff to EWS. While Plaintiff argues that the decisions of these individuals set corporate policy, he presents no evidence to support the contention. Plaintiff relies on the fact that these employees are "upper management" but "whether 'a supervisor is a managing agent within the meaning of [§ 3294] does not necessarily hinge on their level in the corporate hierarchy." Taylor, 58 F.Supp.3d at 1105 (citations omitted). "Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." Id. (citations omitted). "A plaintiff must demonstrate that an alleged managing agent exercises 'substantial discretionary authority over significant aspects of a corporation's business.' " Id. (quoting White, 21 Cal.4th at 577.

1    Plaintiff asserts that Angela Cabrera was an executive in the security branch of Bank of
2    America.   Ms. Cabrera was a Director, Senior Internal Investigations Manager for Bank of
3    America.  (Depo. of Angela Cabrera 4:15-18.)  Plaintiff asserts that Jean Miller was in charge of
4    numerous investigations.  Jean Miller was a director with global financial crimes compliance.
5    (Depo. of Jean Miller 6:6-8.)  Plaintiff's conclusory allegations that these individuals decisions
6    set corporate policy without any evidence as to the discretionary authority possessed by any of
7    the individuals who participated in the 2011 and 2014 disputes is insufficient to create a genuine
8    issue of material fact.

9    Plaintiff has presented no evidence that any individual involved in the actions alleged
10   exercised substantial discretion authority over decisions that ultimately determine corporate
11   policy.  Roby, 47 Cal.4th at 714.  In opposing the motion for summary judgment, Plaintiff must
12   cite to particular parts of materials in the record, including but not limited to depositions,
13   documents, declarations, or discovery; or show that the materials cited do not establish the
14   presence or absence of a genuine dispute or that the opposing party cannot produce admissible
15   evidence to support the fact.  Plaintiff has presented no evidence that any of the individuals
16   involved in this action exercise any substantial discretionary authority over decisions that
17   ultimately determine corporate policy.

18   Plaintiff argues that the White's actions were ratified by the corporation because they
19   were reviewed by upper management.  "For purposes of determining an employer's liability for
20   punitive damages, ratification generally occurs where, under the particular circumstances, the
21   employer demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious
22   behavior by an employee in the performance of his job duties."  Taylor, 58 F.Supp. at 1107
23   (quoting College Hosp. Inc. v. Superior Ct., 8 Cal.4th 704, 726 (1994).  Here, as discussed
24   above, Plaintiff has not demonstrated that any of the employees who handled his disputes
25   exercised substantial discretion authority over decisions that ultimately determine corporate
26   policy.  Roby, 47 Cal.4th at 714.  Plaintiff has presented no evidence that any officer, director or
27   managing agent of Bank of America authorized, ratified, or acted with oppression, fraud, or
28   malice in the decision to report him to EWS or to deny his disputes.

1    Finally, Plaintiff argues that White was acting pursuant to an established corporate policy

2    when she allegedly failed to investigate, failed to comply with EWS Operating Rules, and did

3    not know whether a statutory or regulatory crime had been committed.   Plaintiff refers to the

4    expert opinion of Mr. Keppler which opines that Defendant failed to create a specific and

5    standardized written investigation plan and then sets forth his opinion regarding the deficiencies

6    in Defendant's handling of this matter.   (Decl. of Mark J. Keppler at ¶¶ 9-15.)   However, the

7    failure to maintain a policy is not so wrongful that punitive damages are justified.   Taylor, 58

8    F.Supp.3d at 1109.   In Mathieu v. Norrell Corp., 115 Cal.App.4th 1174 (2004), the appellate

9    court rejected an argument that the failure to maintain a policy would give rise to punitive

10   damages declining "to create new punitive damages liability without legislative history or case

11   authority justifying such an expansion in the law."   Id. at 1191-92.

12   Plaintiff has not met his burden of demonstrating that that there was advance knowledge

13   and conscious disregard, or authorization, ratification or act of oppression, fraud, or malice on

14   the part of an officer, director, or managing agent of the corporation.   Defendant's motion for

15   summary judgment on the punitive damages claim is granted.

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, IT IS HEREBY ORDERED that:

1.  Defendant's motion for summary judgment filed June 27, 2016 is GRANTED IN PART AND DENIED IN PART as follows:

    a.  Defendant's motion for summary judgment on Plaintiff's blacklisting and defamation claims is DENIED; and

    b.  Defendant's motion for summary judgment on Plaintiff's intentional infliction of emotional distress, negligent infliction of emotional distress, interference with contractual relations, breach of implied covenant of good faith and fair dealing, and punitive damages claims is GRANTED.

IT IS SO ORDERED.

Dated:   **August 31, 2016**

UNITED STATES MAGISTRATE JUDGE